**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

BOBBY DYER,

      Plaintiff,

v.                                     Case No.: 3:09-cv-00398

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

      Defendant.

### MEMORANDUM OPINION

This action seeks a review of the decision of the Commissioner of the Social Security Administration denying plaintiff's application for Period of Disability, Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433 and 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos.12 and 18). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 8 and 9).

Plaintiff, Bobby Dyer, filed applications for a period of disability, DIB, and SSI on March 12, 2007 claiming that he had been disabled since August 23, 2006 due to back and groin injuries, chronic pain, and an anxiety disorder with depression. (Tr. at 118-126, 154-159, 402) The Social Security Administration (SSA) initially denied the claims on April 9, 2007 and, upon reconsideration, again denied them on June 8, 2007. (Tr. at 58-67, 80-82). Thereafter, plaintiff filed a written request for a hearing, which was conducted on October 6, 2008 by the Honorable Michelle D. Cavadi, Administrative

1

Law Judge (ALJ).  (Tr. at 83-85, 24-53).  By decision dated November 24, 2008, the ALJ determined that plaintiff was not entitled to benefits. (Tr. at 12-23).  The ALJ's decision became the final decision of the Commissioner on March 20, 2009 when the Appeals Council denied plaintiff's request for review. (Tr. at 1-4).  Plaintiff timely filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g).  (Docket No. 2).

Under 42 U.S.C. § 423(d)(5) and 1382c(a)(3)(H)(i), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. §§404.1520, 416.920.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment.  *Id.* §§404.1520(b), 416.920(b).  If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment.  *Id.* §§404.1520(c), 416.920(c).  If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§404.1520(d), 416.920(d).  If the impairment does, then the claimant is found disabled and awarded benefits.  However, if the impairment does not, the next step of the process is determining whether the claimant's impairments prevent the

performance of past relevant work. *Id.* §§404.1520(e), 416.920(e).  If the impairments do prevent the performance of past relevant work, then the claimant has established of *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  *Id.* §§404.1520(f), 416.920(f); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review."   20 C.F.R. §§404.1520a, 416.920a(a).   First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment.   If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§404.1520a(c) and 416.920a(c).  Those sections provide as follows:

c) *Rating the degree of functional limitation*.

(1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to

which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. §§404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. §§404.1520a(d)(3) and 416.920a(d)(3). The Regulation further

4

specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§404.1520a(e)(2) and 416.920a(e)(2)

In this case, the ALJ determined that plaintiff satisfied the first step of the process, because he had not engaged in gainful activity since the date of the alleged onset of disability. (Tr. at 17, Finding No. 2). Likewise, the plaintiff was deemed to pass the second step with severe impairments of degenerative disc disease of the lumbar spine, anxiety disorder not otherwise specified, with depression, and chronic pain disorder. (Tr. at 17, Finding No. 3). At the third step in the evaluation, the ALJ found that the plaintiff's impairments did not meet or equal the level of severity of any impairments listed in Appendix 1. (Tr. at 18, Finding No. 4). The ALJ concluded from the evidence that the plaintiff had a residual functional capacity to perform light work, adding that he "must be able to alternate between sitting and standing at thirty minute intervals; he can never perform repetitive pushing or pulling with the lower extremities; he can never climb ladders, ropes or scaffolds; he can occasionally kneel, climb stairs, crouch, and stoop; and he can only perform work that can be learned in one or two steps." (Tr. at 19, Finding No. 5). At step four, the ALJ found that the plaintiff was unable to perform any past relevant work. (Tr. at 22, Finding No 6). However, based upon the testimony of the vocational expert, the ALJ concluded that the plaintiff was capable of making "a successful adjustment to other work that exists in significant

numbers in the national economy," including work as a surveillance system monitor, bench work laborer, production inspector, and packaging/filling machine tender. (Tr. at 22-23, Finding No. 10). On this basis, the ALJ found that the plaintiff had not been under a disability, as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 23).

## I.    Scope of Review

The sole issue before the Court is whether the final decision of the Commissioner is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals that the Decision of the Commissioner is supported by substantial evidence.

## II.    Plaintiff's Background

Plaintiff was born in 1961 and was 47 years old at the time of the administrative hearing. (Tr. at 28). He completed high school and spent most of his work life employed

as a laborer for various construction and maintenance companies.  (Tr. at 29-33). Plaintiff's primary language is English, and he is able to read, write, and perform simple mathematical calculations.

### III.   Medical Records

The Court has reviewed all evidence of record, including the medical evidence of record, and will discuss it below. The record includes medical evidence that pre-dates plaintiff's alleged disability onset date of August 23, 2006.  The Court considered this evidence to the extent that it elucidates plaintiff's medical background.

The records reflect that on July 19, 2005, plaintiff presented to the St. Albans Urgent Care complaining of pain in his lower back that radiated down his left leg.  (Tr. at 192-195). Plaintiff advised the treating physician that while at work, he turned and twisted his back in the course of lifting a window and experienced acute low back pain. (Id.). The pain was present and unrelenting regardless of whether he was standing or sitting. (Id.). The physician, Dr. David Life, ordered an MRI that revealed the presence of degenerative disc changes between the fourth and fifth vertebrae of the lumbar spine and at the juncture of the L5-S1. (Tr. at 191). There was some minimal disc protrusion, but no herniation. (Id.). Dr. Life prescribed physical therapy, which plaintiff started on July 26, 2005 at Generations Physical Therapy of Barboursville. (Tr. 196-200). However, after plaintiff made several return visits to the Urgent Care with no discernible improvement in symptoms, Dr. Life referred the plaintiff to a neurosurgeon, Dr. Panos Ignatiadis. (Tr. at 193). The records do not reflect that an appointment was made or kept with Dr. Ignatiadis at that time.

On October 25, 2005, plaintiff, who had made a claim for workers compensation related to his back injury, was evaluated by Dr. Paul Craig, an occupational medicine

specialist retained by the workers compensation insurer to perform an independent medical evaluation. (Tr. at 210-214). Dr. Craig diagnosed acute lumbosacral strain and left-sided sacroiliac joint strain with referred pain to the left buttock and thigh. (Id.). He found no evidence of discogenic disease, nerve root tension, disc herniation, or radiculopathy. Dr. Craig felt the plaintiff was temporarily disabled, but had not yet met his maximum level of medical improvement. (Id.). He suggested that plaintiff be re-evaluated in four to six months and have vocational rehabilitation oversight. Dr. Craig felt plaintiff's prognosis was fair to good. (Id.)

Also in October, 2005, plaintiff began treatment with Dr. Marietta Babayev at the Holzer Clinic in Gallipolis, Ohio. At the initial visit on October 11, 2005, plaintiff told Dr. Babayev that he continued to have burning, stinging, aching, stabbing, throbbing low back pain that was constant and interfered with his ability to sit, stand, lift, walk and bend. (Tr. at 231-239). He denied any bowel or bladder problems. On examination, the plaintiff complained of pain during lumbar range of motion, but was able to heel/toe walk and perform tandem gait without difficulty. His gait, station, alignment, pedal pulses, and muscle strength were all normal. (Id.). In December 2005, Dr. Babayev recommended another functional capacity study and spinal injections by Dr. Timothy Deer, a pain management specialist. (Id.).

During this time frame, plaintiff simultaneously sought treatment for his low back pain from Thompson Chiropractic Clinic. (Tr. at 421-442). On April 3, 2006, Dr. Thompson met with plaintiff and his rehabilitation counselor to discuss his level of improvement. Dr. Thompson recommended that a repeat lumbar MRI be performed and that a neurosurgical consult be obtained if the MRI was positive. (Tr. at 431).

The workers compensation insurer sent plaintiff for a second independent medical examination in May, 2006. At this time, plaintiff was evaluated by Dr. Marsha Bailey. (Tr. at 254-266). Dr. Bailey noted in her report that plaintiff was able to walk without assistive devices. He had negative straight leg raising in the seated position, was able to squat and had negative trunk rotation and axial loading. However, he complained of pain during lumbar range of motion testing and during supine straight leg raising. (Id.). Dr. Bailey diagnosed plaintiff with chronic low back pain and "symptom magnification." She added that plaintiff was "highly pain focused." (Tr. at 258). Dr. Bailey mentioned that she had watched a videotape taken of plaintiff by the workers compensation fraud unit, which showed plaintiff riding a lawnmower, repeatedly twisting and bending "while lifting, carrying, throwing, and moving tree limbs and brush." (Id.). She indicated that, in this tape, plaintiff "moved easily without signs of distress." (Id.). Dr. Bailey concluded that plaintiff had a rating of 0% whole person impairment and was able to work at the light to medium physical demand level. (Tr. at 259).

Thereafter, plaintiff returned to work until August 23, 2006 when he presented to St. Mary Medical Center's Emergency Department complaining of another work-related injury. (Tr. at 274-323). According to the record, plaintiff was at work and was lifting a piece of metal siding when he felt a severe stabbing pain in his right groin. (Id.). He was diagnosed with a groin strain/possible hernia and was referred to the hospital's occupational health center for follow-up care. (Id.). Despite numerous visits to the occupational health center, plaintiff's groin pain did not resolve. (Id.) In fact, it appeared to worsen, although no new objective findings were recorded as a source of the increased pain. Plaintiff was seen by a surgeon, who ruled out a hernia, and by an

urologist, who felt that plaintiff had an underlying epidydimitis and orchitis (bacterial infections).  He was treated with antibiotics, but this treatment did not relief the pain. (Id.)

In February 2007, plaintiff was sent by the workers compensation insurer to Dr. Bruce Guberman at Tri-State Occupational Medicine for an independent medical examination of the groin injury.   (Tr. at 268-273, 326-335).   After performing an examination, Dr. Guberman concluded that plaintiff had complaints of right inguinal pain that did not follow any nerve pattern and was not caused by a hernia, mass, or infection.  He also indicated that there was no detectible injury to plaintiff's hip or thigh. Dr. Guberman felt plaintiff had reached his maximum medical improvement and gave him an impairment rating of 0% for the whole person.  Dr. Guberman commented that the "claimant's allegations of pain and limitations seem to be excessive for the objective evidence.  While he would not engage in heavy work, he appears to be able to engage in medium work activity." (Tr. at 331).

On July 27, 2007, plaintiff underwent a second MRI of his lumbar spine, which was ordered by Dr. C. Dewayne Tackett, an internal medicine specialist with whom plaintiff had consulted for severe pain in his legs radiating to his hip and buttock areas. (Tr. at 563-564).  The MRI report noted minimal changes in the two year period since plaintiff's last MRI, with the primary change being a mild worsening of disc bulging at the L2-L3 level.  Otherwise the exam was stable and reflected multilevel degenerative changes and disc disease. (Id.).  At a follow-up office visit on August 7, 2007, Dr. Tackett noted that plaintiff continued to have "a lot of symptoms" and referred him to Dr. Weinsweig, a neurosurgeon, for evaluation.  He also prescribed Neurontin and Norco for plaintiff's symptoms. (Tr. at 385).

Dr. Weinsweig examined plaintiff on September 25, 2007 and found that neither straight leg raising nor hip rotation bothered plaintiff.  His motor strength was grossly strong, his reflexes were equal, and his sensation was generally intact. (Tr. at 569-571). Dr. Weinsweig reviewed the MRI film and felt that the bulging discs were not "overly severe."  (Id.).  Dr. Weinsweig did not recommend surgery; instead, he suggested referral to a pain clinic.  (Id.).

Plaintiff began treatment with Dr. Ahmet Ozturk, a pain management specialist at the Cabell Huntington Hospital Regional Pain Management Center, on December 14, 2007. (Tr. at 390-396).  Dr. Ozturk diagnosed Lumbar Discopathy and recommended a comprehensive physical therapy and psychological evaluation.  After reviewing the MRI films, he also suggested a provocative discography with consideration of IDET. (Id.).

Kenneth J. Devlin, a licensed psychologist, performed the comprehensive psychological evaluation on plaintiff on March 11, 2008. (Tr. at 398-403)  Based upon a battery of tests, Mr. Devlin assessed plaintiff as suffering from anxiety not otherwise specified with depression.  He noted that plaintiff had dyssomnia (lack of sleep), which probably contributed to his mood disturbance and myofascial pain.  (Id.)

At the time of the hearing, plaintiff continued to treat with Dr. Ozturk.  (Tr. at 45).  He testified that he still had chronic pain in his back, numbness and pain in his legs, anxiety, depression, sporadic difficulty with bowel and bladder elimination, and impairment of memory and concentration. (Tr. at 45-47).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence for the following reasons: (1) the ALJ disregarded the effects of plaintiff's severe degenerative disc disease of the lumbar spine and an anxiety disorder

with depression and chronic pain disorder; (2) the ALJ failed to properly consider plaintiff's pain and to perform any credibility determination; (3) the ALJ failed to consider the combination of plaintiff's impairments; (4) the ALJ failed to accurately develop the evidence;[1] (5) the ALJ failed to produce evidence sufficient to rebut the presumption of disability; and (6) the ALJ improperly disregarded the opinion of the treating physician. (Pl. Br. at 10-16).

The Commissioner argues that (1) the ALJ properly assessed the severity of plaintiff's impairments; (2) the ALJ correctly found that plaintiff's impairments in combination did not meet or equal a listed impairment; (3) the ALJ had sufficient evidence upon which to make a determination; (4) the ALJ did make credibility evaluations, which are documented in the decision; and (5) the ALJ properly weighed the opinion of plaintiff's treating physician. (Def. Br. at 12-21).

### A.      The ALJ's Consideration of the Medical Evidence

Plaintiff argues that the ALJ disregarded the effects of plaintiff's degenerative disc disease and chronic pain on his ability to function and further ignored the cumulative effect of plaintiff's combined physical and psychological impairments. Plaintiff contends that the ALJ fractionalized his impairments, rather than considering the "synergistic" effect that the multiple impairments had on his ability to work. (Pl. Br. at 13).  Contrary to this assertion, the ALJ's decision reflects thoughtful consideration of these issues. In assessing the plaintiff's residual functional capacity, the ALJ acknowledged that plaintiff's degenerative disc disease and chronic pain were severe impairments, but emphasized that the objective testing related to these conditions did

---

[1] This contention will not be addressed by the Court, because plaintiff did not provide a factual basis to support the claim.  Instead, plaintiff merely cited to a collection of cases that discuss the duty of the ALJ to develop the record.  From a review of the transcript and exhibits, the Court finds that the record was sufficiently well-developed for the ALJ to make a determination as to plaintiff's disability for purposes of SSI and DIB.

not support a conclusion that plaintiff had "extensive limitations." (Tr. at 19-21)  The objective testing reflected normal reflexes; the absence of muscle spasms, atrophy, or weakness; and the ability to walk without assistance. A bone scan showed no abnormality of the spine, and the MRI findings were not overly severe. When plaintiff explored the possibility of surgery, the specialist indicated that surgery was not indicated.  (Id.).

Likewise, the ALJ fully analyzed the effect of plaintiff's combined physical and mental impairments on his ability to function.  She noted that plaintiff was able to care for his personal needs, prepare simple meals, visit with his friends, and interact with others.  (Tr. at 18). She further observed that plaintiff had some mildly decreased levels of concentration and memory, largely because he was "distracted by pain," but had never decompensated or deteriorated in work or work-like settings.   (Tr. at 18-19). Clearly, the ALJ took into account all of these factors in reaching her determination that plaintiff could function in a light work capacity.   She expressly acknowledged the combination of plaintiff's chronic pain and mental impairments when she crafted the limitations placed on the job types for which she deemed plaintiff to be qualified.   The ALJ commented that the "pain and objective findings of mildly limited memory and concentration" limited plaintiff to jobs that could be learned in one or two steps. (Tr. at 21).

## B.     The ALJ's Credibility Determination

Plaintiff maintains that the ALJ failed to perform an adequate credibility determination. In support of his position, he argues that both the medical records and his testimony are replete with credible evidence of his limitations, yet the ALJ simply disregarded this evidence.   In truth, the plaintiff is not quibbling about the lack of a

credibility determination, he is quibbling about the ALJ's conclusions regarding his credibility.  The ALJ thoroughly commented on her analysis of plaintiff's credibility, assessing both his demeanor at the hearing and his actions as reflected in the medical records.  (Tr. at 21).  According to the ALJ, she found the plaintiff's credibility as a witness to be "poor," and his allegations of chronic pain to be "not entirely credible." (Id.).  She pointed out that plaintiff had misrepresented his medical history and the status of his workers compensation claims.  (Id.).  Moreover, she learned that videotape taken by the workers compensation insurer suggested that the plaintiff was a malingerer, and the medical records contained an assessment from at least one physician that the plaintiff was highly "pain focused" and displayed "symptom magnification." (Id.)  Moreover, the ALJ emphasized that documentation of medical examinations repeatedly contained evidence of normal findings, as well as the absence of serious abnormal findings, such as nerve root involvement.  (Id.).

"In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, make determinations as to credibility, or substitute its own judgment for that of the Commissioner." See *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).  The Court finds that the record contains substantial evidence to support the conclusions of the ALJ on the issue of credibility; therefore, this argument is without merit.

## C.    The Failure to Rebut The Presumption of Disability

According to plaintiff, the ALJ's decision was "clearly wrong;" therefore, the Commissioner failed to meet his burden to rebut plaintiff's presumption of disability. 20 C.F.R. §§404.1520(f) and 416.920(f) provide that if a claimant has severe impairments which prevent him or her from performing past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the sequential process, that the claimant is able to perform other forms of substantial gainful activity.   The Commissioner must establish that (1) the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job and (2) that this specific job exists in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In this particular case, the ALJ received opinion testimony from Melissa Glannon, a vocational expert.  The ALJ recognized that plaintiff's ability to perform all or substantially all of the exertional demands of light work was "impeded by additional limitations," in that plaintiff could not sit or stand for longer than thirty minutes without changing position and had limited concentration. (Tr. at 22, 51).  Accordingly, the ALJ asked Ms. Glannon how these additional limitations would affect plaintiff's ability to work. (Tr. at 51). Ms. Glannon testified that plaintiff was still able to perform his prior light duty janitorial job with the accommodations that had been made for him by his employer.   (Tr. at 51).   Ms. Glannon added that, even without the accommodations and with his additional limitations, plaintiff could perform light duty jobs such as production inspector, unskilled packager, filling machine tender, and surveillance system monitor. (Tr. at 51-52).  She then confirmed that such jobs were

available both nationally and in the Tri-State region. (Id.).  The substantial evidence rule only requires the Commissioner to "produce adequate evidence to support his conclusion."  *McLamore v. Weinberger, supra* at 575.  Undoubtedly, the Commissioner met this burden through the testimony of the vocational expert.

### D.    The Weight Given by the ALJ to the Opinions of the Treating Physician

Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinions of Dr. Tackett regarding plaintiff's impairments and resulting functional limitations.   The ALJ is required to analyze every medical opinion received and determine the weight to give to such an opinion in making a disability determination. 20 C.F.R. §§ 404.1527(d) and 416.927(d); *See* also *DeBerry v. Astrue,* 2010 WL 3703222 (W.D.Va.).  "A treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  20 C.F.R. §§ 404.1527(d)(2) and 16.927(d)(2). When considering the weight to give a treating physician's opinion, the ALJ must consider a number of factors, including (1) whether the physician has examined the plaintiff; (2) the existence of an ongoing physician-patient relationship; (3) the diagnostic and clinical support for the opinion; (4) the opinion's consistency with the record; and (5) whether the physician is a specialist.  20 C.F.R. §§ 404.1527(d) and 416.927(d); *DeBerry v. Astrue,* 2010 WL 3703222 at 5 (W.D.Va.).  The opinion of the treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). If the ALJ discounts the opinion of a treating physician, the ALJ must explain the reasons for making that determination. *DeBerry v. Astrue, supra.*

In this case, the ALJ expressly indicated that she had discounted Dr. Tackett's opinions regarding plaintiff's limitations, because Dr. Tackett specifically based his opinions on objective medical evidence, which did not "support such extensive limitations." (Tr. at 21). The ALJ referred to the findings on MRI, which reflected only mild to moderate changes, and the recorded medical examinations that showed plaintiff to have normal muscle strength; normal deep tendon reflexes; the ability to walk on his heels and toes without difficulty and pain; and only one observation of gait abnormality. Furthermore, the ALJ relied upon the opinion of the neurosurgery specialist, who commented that the findings were not overly severe. (Id.). The ALJ applied the same critical analysis to the opinions of the occupational medicine specialists retained by the workers compensation insurer, who found the plaintiff capable of performing in the range of medium level work. (Tr. at 21). Relying on objective medical findings, the ALJ discounted the opinions of the insurer's specialists and reached her own determination of the plaintiff's impairment, which is a decision ultimately reserved for the ALJ. 20 C.F.R. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

"The ALJ holds the discretion to give less weight to the testimony of the treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The medical records contain inconsistencies in the evaluations and conclusions of the health care providers. Nonetheless, persuasive evidence exists in the record upon which to conclude that plaintiff's limitations are not as extensive as they are described by Dr. Tackett. For example, the records of Dr. Allen Young at the St. Mary's Medical Center's occupational health clinic contain findings from multiple physical examinations in which the plaintiff is noted to have only mild to moderate inguinal pain; normal gait and

station; normal strength and tone in the extremities; no tenderness in the upper or lower back; and normal psychiatric orientation. (Tr. 338-349). X-rays of the lumbar spine and a CT scan of the pelvis taken at St. Mary's Medical Center were negative for abnormalities. (Tr. at 513-514). Likewise, a CR of the lumbar spine taken on November 7, 2007 demonstrated a normally aligned spine, with no acute abnormalities and normal movement. (Tr. at 397). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990). The Court neither reviews the evidence *de novo* nor resolves inconsistencies in the record; instead, the Court determines from the totality of the record whether substantial evidence exists to support the conclusion of the Commissioner. *Id.* In view of the forgoing, the Court finds that the ALJ had substantial evidence upon which to discount Dr. Tackett's opinion regarding the degree of limitation suffered by plaintiff.

### V.    Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** September 30, 2010.

Cheryl A. Eifert
United States Magistrate Judge

18